Stephani vs. The City of Manitowoc.

STÉPHANI, Administrator, Respondent, vs. THE CITY OF MANI-
TOWOC, Appellant.

*October 11 — November 1, 1898.*

*Municipal corporations: Manitowoc city charter: Appeal bond: Open
drawbridge in street: Contributory negligence: Evidence.*

1. The provisions of secs. 54, 55, 57 of the charter of Manitowoc (ch. 95,
   Laws of 1891), that no action shall be maintained against the city
   upon any account, claim, demand, or cause of action, wherein any
   money judgment or judgment for damages is demanded, until it
   shall first have been presented to the board of aldermen for allow-
   ance or adjustment, and that the determination of such board shall
   be final and conclusive unless appealed from, apply to actions aris-
   ing in tort as well as to demands on contract.
2. A bond, given on appeal in such a case, which binds the appellant to
   faithfully prosecute his appeal in the circuit court and pay all costs
   which shall be adjudged against him in said circuit court, is a suf-
   ficient compliance with sec. 57 of the charter.
3. In an action to recover damages for the death by drowning of plaint-
   iff's intestate, who fell at night into the open draw of a bridge
   which was maintained as a part of the street and was frequently
   opened for the passage of vessels, evidence that no guards were
   provided to prevent pedestrians from walking off from the ap-
   proaches into the river when the draw was open, but that a red
   light was placed in the center of such bridge when the draw was
   open, and a white light when it was closed, *held* sufficient to sus-
   tain a finding that the sidewalk across the bridge was unsafe for
   travel.
4. Evidence in such action that plaintiff's intestate had frequently
   crossed such bridge; that she was a woman possessed of all her
   faculties; that previous to the swinging of the bridge at the time
   of the accident a bell was sounded, which she might have heard;
   that the passing vessel made a loud noise; that, if she had looked
   and listened, she might have known that the bridge was open; and
   that the approaches to the bridge were lighted by electric lights,
   *held* to show such negligence on her part as to preclude a recovery.

APPEAL from a judgment of the circuit court for Manito-
woc county: N. S. GILSON, Circuit Judge. *Reversed.*

This was an action to recover damages on account of the accidental death of the plaintiff's intestate, one Anna Strauch, alleged to have been caused by the negligence of the defendant city. The evidence shows that in the city of *Manitowoc* there are several swing bridges across the Manitowoc river, and that one of said bridges, called the Main street or Tenth street bridge, crosses said river from north to south, and that the same is frequently opened by day and by night for the passage of vessels through the same. The plaintiff's intestate was a resident of the city of *Manitowoc* in August, 1891, and was a woman forty-three years of age, physically strong, and the mother of several children. She was well acquainted with the bridge, knew that it was a swing bridge, and crossed it very frequently. On the night of the 27th of August, 1891, she had been visiting at a friend's house on the south side of the river, and was returning to her own home on the north side of the river, between the hours of 9 and 10 in the evening. No one seems to have seen her approaching the bridge, but the evidence shows without dispute that shortly before she reached the bridge the bridge tender rang the bell thereon, and opened the bridge to permit a steam barge to pass through, and that, just as the barge was about passing through, the intestate walked off from the westerly sidewalk on the south approach of the bridge, into the river, and was drowned. No one saw her fall in, but her screams were immediately heard, and her body was recovered within a short time. The night was somewhat dark and cloudy, but it was not storming at the time of the accident. There were two twenty-four-candle power electric lights near the bridge,— one immediately over the east sidewalk on the south approach, ninety-eight feet south of the draw, and one immediately over the west sidewalk on the north approach, 126 feet north of the draw. There was also a kerosene lamp placed upon the middle of the bridge, eight feet above the floor, which cast a red light toward the approach on

each side of the bridge when the bridge was open, and a white light when the bridge was shut. The swing part of the bridge was 162 feet in length. All of these lights were lighted at the time of the accident. There were no guards upon the approaches of the bridge to prevent people from walking into the river when the bridge was open.

The following special verdict was rendered by the jury: "1st question: Did the plaintiff's intestate, Anna Strauch, on the 27th day of August, 1891, at the time and place complained of, walk along the west walk of the approach to the bridge, and fall therefrom into the Manitowoc river, causing her death by drowning? Ans. Yes. (By consent of counsel.) 2nd question: On the 27th day of August, 1891, at the time it is alleged the plaintiff's intestate fell into the river and was drowned, was the sidewalk across the bridge at the place in question insufficient and unsafe for travel over the same on foot by persons in the exercise of ordinary care? Ans. Yes. (By the jury.) 3rd question: At the time and place complained of, did the absence of a guard or gate at the end of the approach next to the drawbridge, the position and kind of electric lights on the north and south approaches to the bridge, the danger light on the drawbridge, and the ringing of the bell before turning the draw, make travel over and along the west walk unsafe or dangerous to persons using ordinary care? Ans. Yes. (By the jury.) 4th question: Was the plaintiff's intestate, for a considerable time before her death, familiar with the bridge, and with the signal light on the drawbridge, and know what such signal light meant? Ans. First question, yes; second question, no. (By the jury.) 4½ question: Was the plaintiff's intestate, for a considerable time before her death, familiar with the electric lights on the north and south approaches to the bridge, and that the draw might be swung open at any time for the passage of vessels? Ans. (by consent of counsel) Yes. 5th question: On the night in ques-

tion, at the time Mrs. Anna Strauch was approaching this bridge and before she reached the drawbridge, could she have seen that the draw was open if she had looked? Ans. No. (By the jury.) 6th question: Did ordinary care require Mrs. Anna Strauch, when she reached the approach to the bridge, to look to see whether the draw was closed, before attempting to pass upon and over the same? Ans. Yes. (By consent of counsel.) 7th question: At the time and place in question, was Mrs. Anna Strauch guilty of any want of ordinary care which contributed to produce or cause her death? Ans. No. (By the jury.) 8th question: In case the court shall be of the opinion that the plaintiff is entitled to recover, then at what sum do you assess plaintiff's damages? Ans. At $1,770. (By the jury.)"

Judgment for the plaintiff was granted upon this verdict, and the defendant appeals.

*G. G. Sedgwick*, for the appellant.

For the respondent there was a brief by *Schmitz & Kirwan*, and oral argument by *A. J. Schmitz*.

WINSLOW, J. On the 29th of November, 1891, the plaintiff filed with the city clerk of the city of *Manitowoc* a claim against the city in the sum of $5,000 on account of the death of his intestate, which claim was entirely disallowed by the board of aldermen of the city, whereupon the plaintiff appealed to the circuit court, and gave a bond upon such appeal in attempted compliance with the provisions of the charter of the city. It was objected at the outset of the trial in the circuit court that no jurisdiction of the action had been acquired by that court, because the action was a tort action and should have been commenced by summons; and that the provisions of the charter of *Manitowoc*, providing for appeals to the circuit court from the action of the council, apply only to contract demands. This contention seems to be sufficiently answered by reference to secs. 54, 55, 57,

of defendant's charter (ch. 95, Laws of 1891), which read as follows:

"Sec. 54. No action shall be maintained by any person or corporation against the city of *Manitowoc*, upon any account, claim, demand or cause of action, wherein any money judgment or judgment for damages is demanded, until such person or corporation shall have first presented his account, claim, demand, or cause of action to the board of aldermen for allowance or adjustment.

"Sec. 55. The determination of the board of aldermen disallowing, in whole or in part, any claim of any person, shall be final and conclusive and a perpetual bar to any action in any court founded on such claim, unless an appeal be taken from the decision and determination of such board as in this act provided."

"Sec. 57. When any claim against the city shall be disallowed in whole or in part by the board of aldermen, such person may appeal from the decision of said board disallowing said claim to the circuit court of Manitowoc county by causing a written notice of such appeal to be served on the clerk of said city within twenty days after the making of such decision and by executing a bond to the said city, with sufficient surety, to be approved by said clerk, conditioned for the faithful prosecution of such appeal and the payment of all costs that shall be adjudged against the appellant in the circuit court. The clerk, in case such appeal is taken, shall make a brief statement of the proceedings had in the case before the board of aldermen, with its decision thereon, and shall transmit the same, together with the bond and all the papers in the case, to the clerk of the circuit court of Manitowoc county, and thereupon such appeal shall be entered, tried and determined in the same manner as cases originally commenced in said court. . . ."

A cause of action like the one before us is certainly a cause of action wherein a judgment for damages is demanded, and

it therefore clearly comes within the terms of the foregoing sections, which seem to have been carefully framed with the intention of including tort as well as contract demands.

An objection was also made to the bond given on appeal, because it was claimed that the bond only bound the appellant to pay all the costs which might be adjudged against him in the circuit court *of Manitowoc county*, whereas the statute requires an undertaking to pay all costs *in the circuit court*, and the case of *Drinkwine v. Eau Claire*, 83 Wis. 428, is relied upon. The condition of the bond is as follows: "Now, therefore, if the said bounden *William Stephani* shall faithfully prosecute said appeal in the *circuit court*, and pay all costs which shall be adjudged against him in *said* circuit court, then this obligation shall be void," etc. We regard this as very plainly complying with the statute. Discussion does not seem necessary.

Proceeding now to the merits of the case, we find very few adjudications touching the duties of the corporation maintaining a swing bridge, and fewer yet which discuss the duties of the traveler approaching such a bridge. The principles, however, which must govern the rights of both parties cannot be difficult of ascertainment or application. The bridge (although it be a swing bridge) is an essential part of the highway. Moreover, under the terms of sec. 1339, R. S. 1878, if, by reason of any insufficiency therein, a traveler suffers injury without contributory negligence, the city is liable for such injury. In this very case it has been held, upon demurrer to the complaint, that, if barriers or lights were necessary to protect travelers from falling from the bridge when the draw was open, then the absence of such barriers or lights was an insufficiency or defect in the structure of the bridge. *Stephani v. Manitowoc*, 89 Wis. 467. This is the law of the case so far as the duty of the city is concerned; and, the evidence showing that there were no such barriers, there was ample foundation for the finding of

the jury to the effect that the sidewalk across the bridge was insufficient and unsafe for travel. See, also, *Chicago v. Wright,* 68 Ill. 586; *Chicago v. McDonald,* 57 Ill. App. 250.

As to the rights and duties of the traveler, it is, in effect, claimed by the plaintiff that they are no different from the rights and duties of a traveler upon an ordinary highway; that he has the right to assume that the bridge is safe for travel, and to proceed under that assumption; and that temporary forgetfulness of a known defect is not necessarily negligence. *Simonds v. Baraboo,* 93 Wis. 40. On the other hand, it is claimed by the defendant that it is the duty of one approaching a swing bridge, which he knows is frequently open, to look and listen in the same manner as he is required to do when approaching a railway crossing; and that if he fails so to do, he is chargeable with knowledge of all that he might have learned had he looked. *McKinney v. C. & N. W. R. Co.* 87 Wis. 282.

Before considering this question, a brief recapitulation of undisputed facts is necessary. The swing part of the bridge is 162 feet in length. The river itself between dock lines is about 380 feet in width, the south approach being nearly 100 feet in length, and the north approach about 120 feet in length. These approaches are in the nature of stationary bridges or viaducts connecting the street with the swing bridge. They are planked, are narrower than the street, and have handrails at the side; and at the land end of each approach there is hanging over the sidewalk a twenty-four-candle power electric light, so that none could fail to know that he was nearing the bridge when he approached from either direction. The bridge apparently had no superstructure above the roadway save a railing on each side, nearly four feet in height, filled with metal netting, and a further rail on each side of the carriageway, separating it from the footway. The red signal light was nearly eight feet above the floor of the bridge and in the exact middle above one of

the last-named rails. The plaintiff's intestate had lived in Manitowoc for many years, and had crossed and recrossed the bridge, both in the daytime and in the evening, almost daily, for years. It is admitted that she must have known that it was a swing bridge, that it was frequently opened, and that there were no guards, and that a person who walked off from the approach would go into the river. She was a strong, able-bodied woman, in full possession of all her faculties, and in the prime of life.

Now, in view of her knowledge of the situation and the danger, what was her duty when she entered upon the south approach of the bridge? She then knew that the bridge was a hundred feet ahead of her. Could she say to herself: That bridge ought to be closed, and I am entitled to act on the assumption that it is closed, or that, if open, there is a guard in front of it which will prevent my walking into the chasm? Or, on the other hand, must she say to herself: I am now approaching a swing bridge. It may be open, and I know there is no guard. I must use my eyes and ears to the best advantage to guard against the possibility of walking into the open draw? Reason and common sense indicate but one answer to these questions, and that is that she must adopt the second course, if she would exercise ordinary care. Such is the course absolutely demanded of one who is knowingly approaching a railway crossing. The reason is that the crossing itself is a danger signal which the traveler cannot ignore. The approach to a swing bridge is an advertisement of danger to one who knows the character of the bridge, which speaks as loudly, and logically calls for as great an exercise of care, as the track of a railway. The possible yawning chasm is as great and real a danger as the possible rushing locomotive, and the warning that it may exist is just as emphatic.

In the present case the jury has found that the plaintiff's intestate could not have seen that the draw was open if she

had looked. This finding is based only on the fact that it was a
dark night, and the testimony of two witnesses, who say that
by looking down in front of them they could not tell whether
the bridge was open or closed, because it was too dark.
These same witnesses, however, admit that if one approach-
ing from the south were to look at the electric light on the
north approach of the bridge, he could plainly see the open
bridge between himself and the light. This is substantially
the testimony of all the witnesses, and it accords with reason.
The requirement of ordinary care in approaching the bridge,
after being advertised of the danger by the very fact of
walking up and over the approach, would not be satisfied by
"looking down in front" upon the sidewalk, but would re-
quire looking ahead, if there were lights ahead; and if, as
appears beyond dispute in this case, there was a light imme-
diately ahead, which, when looked at, would show that the
bridge was open, then the failure to look and observe would
be a failure to exercise ordinary care under the circum-
stances. There is much testimony, also, that the intestate
failed to use her ears as well as her eyes. The bridge bell
was admittedly rung before the bridge was opened, and the
evidence shows that it could be heard several blocks away;
the steam barge which was approaching the bridge was
making a slow exhaust as it approached the bridge, which
made quite a loud noise; and there is also proof that a man
with an omnibus and team drove up on the south approach
after the bridge was open, and discovered it to be open by
seeing the danger signal, and backed his team around, and,
just as he was starting away, heard the splash of the plaint-
iff's intestate falling in. All these facts indicate clearly that
the intestate neither looked nor listened. It was her duty
to look and listen when she was advised by the approach
that she was nearing what might be an open chasm; and, it
being clear that, if she had looked, she could have seen that

the bridge was open, the verdict is unsupported by the evidence and cannot stand.

*By the Court.*— Judgment reversed, and action remanded for a new trial.